**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CONNIE J. EDMONSON, individually and on behalf of all others similarly situated, | : : : | CIVIL ACTION |
| Plaintiff, | : : | |
| v. | : : | |
| | : | NO. 10-4919 |
| LINCOLN NATIONAL LIFE INSURANCE COMPANY, et al., | : : : | |
| Defendants. | : | |

**MEMORANDUM ON LINCOLN'S MOTION FOR SUMMARY JUDGMENT
AND PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

Baylson, J.                                                               February 3, 2012

## I.     Introduction

This case requires the Court to revisit a difficult issue of first impression in the Third Circuit concerning the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq.  The precise issue presented is whether an insurer of an ERISA-governed employee welfare benefits plan – the terms of which do not specify the method of payment of life insurance proceeds – was acting as an ERISA fiduciary when it held and invested for its own profit the funds backing retained asset accounts used to pay plan beneficiaries their proceeds. The Court initially addressed this issue in detail in its previous opinion denying Defendant Lincoln National Life Insurance Company's ("Lincoln") Motion to Dismiss.  See Edmonson v. Lincoln Nat'l Life Ins. Co. ("Edmonson I"), 777 F. Supp. 2d 869 (E.D. Pa. 2011).

A retained asset account is an interest-bearing account backed by funds that an insurer retains until the account holder writes a check or draft against the account.   Lincoln issued such

an account to Plaintiff Connie J. Edmonson so that she could draw down the life insurance proceeds owed to her as she saw fit.  Plaintiff alleges that, through the use of retained asset accounts, Lincoln profited from the spread it earned on the funds backing those accounts and the interest it paid to beneficiaries.  According to Plaintiff, Lincoln's retention of this profit constitutes unjust enrichment.

Presently before the Court are Lincoln's Motion for Summary Judgment (ECF No. 52), Plaintiff's Cross-Motion for Partial Summary Judgment (ECF No. 68),  Plaintiff's Motion for Class Certification (ECF No. 63), Plaintiff's Motion to Compel Discovery (ECF No. 66), and Lincoln's Motion to Stay Discovery (ECF No. 73).   For the reasons set forth below, Lincoln's Motion for Summary Judgment is GRANTED and Plaintiff's Cross-Motion for Partial Summary Judgment is DENIED.  Accordingly, each of the parties' remaining motions is DENIED as moot.

## II.    Procedural History

On September 21, 2010, Plaintiff commenced a putative class action lawsuit on behalf of herself and all others similarly situated by filing a single-count complaint against Lincoln and John Does 1 through 100 for breach of fiduciary duty under ERISA.  Plaintiff alleges that, by establishing retained asset accounts called SecureLine accounts to pay life insurance proceeds and investing the funds backing those accounts for its own profit, Lincoln breached its ERISA fiduciary duties to abstain from self-dealing in plan assets and to act solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing benefits to them.

Plaintiff seeks the following relief: an order certifying the claims of Plaintiff and all others similarly situated and appointing Plaintiff as class representative and Plaintiff's counsel as class counsel; a declaratory judgment pronouncing that Lincoln was unjustly enriched and

directing Lincoln to hold Plaintiff's interest in constructive trust; disgorgement and equitable distribution of the funds held in constructive trust; attorney's fees, expenses and costs; and further relief that the Court deems just and proper.[1]

On April 1, 2011, this Court denied Lincoln's Motion to Dismiss for lack of jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. See Edmonson I, 777 F. Supp. 2d at 892-93. Initially, the Court rejected Lincoln's jurisdictional contention that Plaintiff lacked standing to pursue her claim. Id. at 879-83. Next, the Court performed a detailed analysis of whether Plaintiff stated a claim for breach of fiduciary duty under ERISA. Id. at 883-91.

Ultimately, the Court determined that, while Lincoln's contentions potentially had merit, several unresolved issues of fact precluded dismissal of the action. The Court recognized that, as a threshold matter, in order for Plaintiff to successfully state a claim for breach of fiduciary duty under ERISA, she had to allege that Lincoln was acting as an ERISA "fiduciary" when it invested the funds backing her SecureLine account for its own profit. Id. at 884. According to the Court, "[w]here the benefits are held, and the level of control [Lincoln] exercises over benefits before the beneficiary cashes out the SecureLine account, are key factual inquiries in determining [Lincoln's] fiduciary status." Id. at 885. More specifically, there were issues of fact as to "whether [Lincoln] relinquished authority and control of the funds when it established the SecureLine account and when it actually moved the benefits into the account." Id. at 888. In addition, there were issues of fact as to "whether the benefits are actually put into the SecureLine account for the beneficiary's immediate use, or whether they are not moved into the account until

---

[1]Plaintiff subsequently withdrew her prayer for injunctive relief.

the beneficiary draws a draft on the account." Id. at 891.   Drawing inferences from these unresolved issues of fact in favor of Plaintiff, the Court concluded that Plaintiff had stated a claim for breach of fiduciary duty under ERISA and that limited discovery on the issue of Lincoln's fiduciary status was appropriate.  Id. at 874, 891.

On September 12, 2011, following discovery on the issue of its fiduciary status, Lincoln filed a Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  (ECF No. 52.)  In its motion, Lincoln principally urges the Court to follow the rationale of  Faber v. Metropolitan Life Insurance Co., 648 F.3d 98 (2d Cir. 2011), a case decided by the Second Circuit several months after this Court's decision on Lincoln's Motion to Dismiss. In Faber, the Second Circuit held that an insurer was not acting as an ERISA fiduciary when it invested the funds backing retained asset accounts for its own profit.  Id. at 107.

On October 24, 2011, Plaintiff filed a Response in Opposition to Lincoln's Motion for Summary Judgment (ECF No. 61).  In her response, Plaintiff contends that Faber should not dictate the outcome of this case.  Rather, Plaintiff primarily argues that the Court should follow the rationale of Mogul v. UNUM Life Insurance Co. of America, 547 F.3d 23 (1st Cir. 2008), a case discussed at length in this Court's prior opinion on Lincoln's Motion to Dismiss.  Contrary to Faber, the First Circuit held in Mogul that an insurer was acting as an ERISA fiduciary when it invested the funds backing retained asset accounts for its own profit.  Id. at 27.

On November 9, 2011, before briefing on Lincoln's Motion for Summary Judgment was completed, Plaintiff unexpectedly filed a Cross-Motion for Partial Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.  (ECF No. 68.)  In her cross-motion, Plaintiff advances largely the same arguments made in her Response in Opposition to Lincoln's

4

Motion for Summary Judgment.   The next day, on November 10, 2011, Lincoln filed a Reply in

Further Support of Its Motion for Summary Judgment.  (ECF No. 70.)  On November 23, 2011,

Lincoln then filed a Response in Opposition to Plaintiff's Cross-Motion for Summary Judgment

(ECF No. 80), repeating predominantly the same arguments made in its Motion for Summary

Judgment and Reply in support thereof.  Finally, on December 7, 2011, Plaintiff filed a Reply in

Further Support of Her Cross-Motion for Summary Judgment.  (ECF No. 84.)[2]

On December 21, 2011, the Court held oral argument on Lincoln's Motion for Summary

Judgment and Plaintiff's Cross-Motion for Partial Summary Judgment.  The Court specifically

addressed, among other things, each of the unresolved factual issues pertaining to Lincoln's

fiduciary status outlined in its prior opinion on Lincoln's Motion to Dismiss.  Counsel for both

Lincoln and Plaintiff clarified each of these issues and explained that they had since been

resolved through discovery.

## III.    Factual Background

The following relevant facts are undisputed.[3]  Plaintiff's late husband was insured under a

---

[2]During the course of briefing on Defendant's Motion for Summary Judgment and
Plaintiff's Cross-Motion for Partial Summary Judgment, the parties filed several other motions,
which are currently pending before the Court.  On October 24, 2011, Plaintiff filed a Motion for
Class Certification.  (ECF No. 63.)  On November 3, 2011, Plaintiff also filed a Motion to
Compel Discovery (ECF No. 66).  On November 16, 2011, Lincoln filed a Motion to Stay
Discovery (ECF No. 73), and the next day, filed a Response in Opposition to Plaintiff's Motion
to Compel (ECF No. 74).  On November 23 and 30, 2011, Plaintiff filed a Reply in Further
Support of Her Motion to Compel (ECF No. 82) and a Response in Opposition to Lincoln's
Motion to Stay (ECF No. 83), respectively.

[3]The parties each submitted statements of undisputed facts for purposes of their
respective motions for summary judgment and responded to their opponent's statements of
undisputed facts. (See ECF Nos. 53, 62, 69, 71, 81.)  As the parties themselves acknowledge and
as is evident from the fact that both parties have moved for summary judgment, there are no
disputed material facts preventing entry of summary judgment.

group life insurance policy (the "Policy") issued by Lincoln to an ERISA-governed employee

welfare benefits plan (the "Plan") sponsored by Plaintiff's employer, Schurz Communications,

Inc.  (Plaintiff's Responses to Lincoln's Statement of Undisputed Facts in Support of Its Motion

for Summary Judgment ("Pl. RSF") (ECF No. 62), at ¶ 2; Defendant's Responses to Plaintiff's

Statement of Undisputed Facts in Support of Her Motion for Partial Summary Judgment ("Def.

RSF") (ECF No. 81), at ¶ 1.)  Plaintiff's husband was insured as her dependent under the Plan.

(Def. RSF ¶ 2.)  As his beneficiary under the Plan, Plaintiff was entitled to the life insurance

proceeds called for by the Plan upon his death.  (Compl. ¶ 16.)

    The operative benefits provision in the Policy appears in a section, titled

"DEPENDENTS LIFE INSURANCE."  (Pl. RSF ¶ 3.) That provision provides as follows:

> BENEFIT.  Upon receipt of satisfactory proof of a Dependent's death while
> insured under this Policy, the Company will pay the amount of the Dependents
> Life Insurance in effect on the date of such death.  This amount is shown in the
> Schedule of Insurance.  The death benefit will be paid:
>
>> (1) to the Insured Person; or
>> (2) if the Insured Person fails to survive the Dependent, to the Insured
>> Person's Beneficiary or according to the Facility of Payment Section.

(Pl. RSF ¶ 3; Declaration of Joseph Paul McKinnon, Jr. ("McKinnon Decl.") (ECF No. 54), Ex.

4 at Edmonson 075.)  In another section, titled "CLAIMS PROCEDURES FOR LIFE OR

ACCIDENTAL DEATH AND DISMEMBERMENT (AD&D) BENEFITS," the Policy contains

the following provision:

> "TIME OF PAYMENT OF CLAIMS: Any benefits payable under this Policy will
> be paid immediately after the Company receives complete proof of claim."

(Pl. RSF ¶ 4; Def. RSF ¶ 3; McKinnon Decl. at Edmonson 077.)

    On March 30, 2009, after her husband had passed away, Plaintiff submitted a claim form

(the "Claim Form") for death benefits under the Plan to Lincoln.  (Pl. RSF ¶ 9; Def. RSF ¶ 6;

Compl. Ex. A.)  The Claim Form explained that "[i]f the amount payable to you is $5,000 or

more, [Lincoln's] usual method of payment is to open a SecureLine Account, which gives you

complete control of your funds" and is "a personal, interest-bearing account."  (Pl. RSF ¶ 6; Def.

RSF ¶ 7; Compl. Ex. A.)  The Claim Form also explained that, with a SecureLine Account,

"instead of receiving a lump sum of money through the mail, you will receive a checkbook" and

"[y]ou may write checks for any amount over $250 and up to your full balance at any time."  (Pl.

RSF ¶ 7; Def. RSF ¶ 7; Compl. Ex. A.)

On April 8, 2009, Lincoln notified Plaintiff by letter that it had approved her claim in the

amount of $10,000. (Pl. RSF ¶ 10.)  The following day, April 9, 2009, Lincoln sent another letter

to Plaintiff informing her that it had established a SecureLine Account in her name in the amount

of $10,000.  (Pl. RSF ¶ 11; Def. RSF ¶ 11; Compl. Ex. B.)  With that letter, Lincoln also

provided Plaintiff with a checkbook, a certificate of confirmation (the "Certificate of

Confirmation"), a statement of SecureLine's terms and conditions (the "Terms and Conditions"),

and a booklet describing SecureLine's features (the "Booklet").  (Pl. RSF ¶ 12; Def. RSF ¶ 12;

Compl. Exs. C, D & E.)

The Certificate of Confirmation showed that $10,000 – the full amount of life proceeds

owed to Plaintiff – had been credited to her account.  (Pl. RSF ¶ 13; Compl. Ex. C.)  In addition,

the Terms and Conditions stated that Plaintiff would receive a minimum interest rate "equal to

the national average for interest bearing checking accounts as published by <u>Bloomberg</u>, plus

1%."  (Pl. RSF ¶ 14; Def. RSF ¶¶ 12, 31; Compl. Ex. D.)  Moreover, the Booklet explained to

Plaintiff "[i]f you decide you want the entire proceeds immediately, you just need to write one

check for the entire account balance."  (Pl. RSF ¶ 15; Def. RSF ¶ 12; Compl. Ex. E.)

On July 27, 2009, Plaintiff withdrew the entire amount of life insurance proceeds owed to her from her SecureLine account.  (Pl. RSF ¶ 17; Def. RSF ¶ 14.)  Her account was later closed and a check was issued to her for the $52.33 of interest that had accumulated on the account since it was opened.  (Pl. RSF ¶¶ 16-18; Def. RSF ¶ 14.)

Plaintiff's SecureLine account operated like all other SecureLine accounts that Lincoln established.  (Pl. RSF ¶ 19; Def. RSF ¶ 28.)  When Lincoln creates a SecureLine account, it credits the account with the full amount of proceeds owed to the account holder.  (Pl. RSF ¶ 20.)  At that time, Lincoln does not transfer any funds to the SecureLine account.  (Id. ¶ 19; Def. RSF ¶ 29.)  Instead, Lincoln transfers funds to the bank servicing the account when a check is drawn on the account and presented for payment.  (Pl. RSF ¶ 20; Def. RSF ¶ 29.)  Until that time, the funds backing the SecureLine account are held in Lincoln's own general account with other assets.  (Pl. RSF ¶ 20; Def RSF ¶ 30.)  Lincoln does not segregate those funds, and only draws from its general account funds necessary to cover checks presented for payment.  (Pl. RSF ¶ 21.)

## IV.    Jurisdiction

Because Plaintiff's claim arises under ERISA, this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

## V.    Standard of Review

A court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a).[4]   A dispute is "genuine" if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under

the governing law."  Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the

moving party's initial burden can be met simply by showing the court that "there is an absence of

evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325

(1986).  The party opposing summary judgment must rebut by making a factual showing

"sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."  Id. at 322.  The court may grant summary judgment

"[i]f the evidence is merely colorable, or is not significantly probative." Anderson, 477 U.S. at

249 (citations omitted).  The court must view the evidence in the light most favorable to the

non-moving party and draw all justifiable inferences in favor of the non-movant.  Id. at 255

(citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

---

[4]Because this civil action was pending when the Amendments to the Federal Rules of
Civil Procedure became effective on December 1, 2010, the Court references the amended
summary judgment standard in Rule 56(a) of the Federal Rules of Civil Procedure, which
substitutes "genuine dispute" for "genuine issue," the phrase in former subdivision (c).
According to the Rules Advisory Committee, the 2010 Amendments do not affect the substantive
standard for summary judgment or the applicability of prior decisions construing the standard.
Fed. R. Civ. P. 56 Advisory Committee's Note.  Pursuant to 28 U.S.C. § 2074(a) and the April
28, 2010 Supreme Court order, the amended rule governs all proceedings commenced on or after
December 1, 2010, and all proceedings then pending, "insofar as just and practicable." United
States Courts, Rules and Forms in Effect: Rules and Forms Amendments Effective 12/1/10,
http://www.uscourts.gov/Rule
sAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx (last visited Apr. 5, 2011).

VI.    **Discussion**

A.    **ERISA Framework Concerning Fiduciary Status**

Plaintiff alleges that Lincoln violated its fiduciary duties imposed by two specific

provisions of ERISA.  The first, ERISA Section 404(a), requires a fiduciary to "discharge his

duties with respect to a plan solely in the interest of the participants and beneficiaries and for the

exclusive purpose of providing benefits to participants and their beneficiaries."  29 U.S.C. §

1104(a)(1)(A)(i). And the second, ERISA Section 406(b), provides that "[a] fiduciary with

respect to a plan shall not deal with the assets of the plan in his own interest or for his own

account." 29 U.S.C. § 1106(b)(1).  A defendant is only liable for breach of its fiduciary duties

imposed by these provisions if it was "acting as a fiduciary (that is, was performing a fiduciary

function) when taking the action subject to complaint."  Pegram v. Herdrich, 530 U.S. 211, 226

(2000).

In this case, as Plaintiff recognizes, "the actions subject to complaint are Lincoln's

retention of Plaintiff's benefits using a SecureLine Account, Lincoln's investment of Plaintiff's

funds for its own account, and Lincoln's retention of profits earned through the investment of

Plaintiff's funds." (Pl. Resp., ECF No. 61, at 15; accord Pl. Mot., ECF No. 68, at 11.)  Therefore,

to maintain a claim for breach of fiduciary duty under ERISA, Plaintiff must establish that

Lincoln was acting as a "fiduciary," as that term is defined by ERISA, when it took these actions.

Determining whether a defendant is an ERISA fiduciary is a question of law when there

are no disputes of fact regarding the defendant's actions.  Srein v. Frankford Trust Co., 323 F.3d

214, 220 (3d Cir. 2003) (holding that determination of fiduciary status was a question of law

when parties disputed whether defendant's actions and plan agreements bestowed fiduciary status

on defendant, but not the factual findings regarding those actions and agreements).  Because

there are no remaining material disputes of fact regarding Lincoln's actions, the Court has a duty

to resolve Lincoln's fiduciary status as a matter of law.

> **1.     Definition of "Fiduciary"**

Unlike a common law trustee, an ERISA fiduciary is defined "in <u>functional</u> terms of

control and authority over the plan."  <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 262 (1993)

(citing 29 U.S.C. § 1002(21)(A)) (emphasis in original).  Under Section 3(21)(A) of ERISA, an

entity is a "fiduciary" with respect to an employee welfare benefit plan to the extent it "exercises

any discretionary authority or discretionary control respecting management of such plan or

exercises any authority or control respecting management or disposition of its assets," or "has

any discretionary authority or discretionary responsibility in the administration of such plan."  29

U.S.C. § 1002(21)(A).  Because Congress intended for ERISA to provide broad protection of

retirement benefits, the term "fiduciary" is, as a general matter, broadly construed.  <u>John</u>

<u>Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank</u>, 510 U.S. 86, 96 (1993); <u>see also</u> <u>Curcio</u>

<u>v. John Hancock Mut. Life Ins. Co.</u>, 33 F.3d 226, 233 (3d Cir. 1994) ("We start from the

standpoint that we have previously held that ERISA broadly defines a fiduciary." (citing <u>Smith v.</u>

<u>Hartford Ins. Grp.</u>, 6 F.3d 131, 141 n.13 (3d Cir. 1993))).

As this Court previously recognized, Plaintiff's breach of fiduciary duty claim is based on

facts relating to Lincoln's management or disposition of plan assets, not Lincoln's management

or administration of a plan.  <u>Edmonson I</u>, 777 F. Supp. 2d at 886.[5]  In ERISA Section 404(a),

---

[5]Despite the Court's prior ruling to the contrary, Plaintiff reasserts her contention that her
breach of fiduciary duty claim could also be based on facts relating to Lincoln's management or
administration of the plan itself.  Although the Court need not reach this question, the Court

Congress used the term "discretionary" in connection with a fiduciary's authority or control

respecting the management or administration of a <u>plan</u> itself, but omitted the term in connection

with a fiduciary's authority or control respecting the management or disposition of <u>plan assets</u>.

29 U.S.C. § 1002(21)(A)(i).  This careful parsing of the definition reflects that Congress did not

require a fiduciary to exercise discretion over plan assets; rather, Congress intended fiduciary

duties to attach automatically to control of plan assets.  <u>Bd. of Trs. of Bricklayers & Allied</u>

<u>Craftsmen Local 6 of N.J. Welfare Fund v. Wettlin Assocs. Inc.</u>, 237 F.3d 270, 273-74 (3d Cir.

2001); <u>see also</u> <u>David P. Coldesina, D.D.S., P.C. Emp. Profit Sharing Plan v. Estate of Simper</u>,

407 F.3d 1126, 1132 (10th 2005) ("In Congress's judgment, and consistent with general trust

law, parties controlling plan assets are <u>automatically</u> in a position of confidence by virtue of that

control, and as such they are obligated to act accordingly."); <u>IT Corp. v. Gen. Am. Life Ins. Co.</u>,

107 F.3d 1415, 1421 (9th Cir. 1997) (discussing how "[t]he statute treats control over the cash

differently from control over administration," in order to "assur[e] that people who have practical

control over an ERISA plan's money have fiduciary responsibility to the plan's beneficiaries").

Accordingly, when – as in this case – the actions subject to complaint relate to the management

or disposition of plan assets, the crux of the analysis is whether the defendant exercised "any

authority or control" over "plan assets" when it took those actions.  <u>Edmonson I</u>, 777 F. Supp. 2d

at 886.[6]

---

notes below that once Lincoln established Plaintiff's SecureLine Account, credited it with the
amount of death benefits owed to her, and issued her a checkbook with which she could draw on
the account, Lincoln would have discharged its fiduciary obligations under ERISA in relation to
the management or administration of the plan itself.  See <u>infra</u> notes 6 & 14.

[6]In contrast, when the actions complained of relate to the management or administration
of a plan itself, the central inquiry is whether the defendant exercised discretion when it took

The Third Circuit has not addressed whether an insurer of an ERISA-governed employee welfare benefits plan acts as an ERISA fiduciary when it holds and invests for its own profit the funds backing retained asset accounts used to pay plan beneficiaries their life insurance proceeds. However, as noted above, in Mogul v. UNUM Life Insurance Co. of America, 547 F.3d 23 (1st Cir. 2008), and Faber v. Metropolitan Life Insurance Co., 648 F.3d 98 (2d Cir. 2011), both the First Circuit and the Second Circuit addressed the issue in similar circumstances to the case at bar. These cases provide useful guidance in determining whether Lincoln exercised "any authority or control" over "plan assets" when it retained and invested the funds backing Plaintiff's SecureLine account for its own profit.

2.    <strong>Mogel v. UNUM Life Insurance Co. of America</strong>

In Mogel, UNUM Life Insurance Company of America ("UNUM") paid death benefits to beneficiaries under group life insurance policies through the use of retained asset accounts called Security Accounts. 547 F.3d at 25. The holder of a Security Account could write a check against the account up to the full amount of death benefits owed to the holder. Until that amount was fully withdrawn, UNUM retained the funds backing the account and invested them for its own profit. Id. at 26.

The policies at issue provided that "all benefits payable . . . will be paid as soon as the

_____

those actions. In such cases, the determination of whether the defendant was acting in a fiduciary capacity depends on whether it was carrying out "discretionary" or "ministerial" functions. See, e.g., Confer v. Custom Eng'g Co., 952 F.2d 34, 39 (3d Cir. 1991) (plan supervisor with no discretion to allow or deny claims, no authority to alter the written plan, and duty to follow instructions of plan administrator, "perform[ed] purely ministerial tasks" and was not an ERISA fiduciary). Because the actions complained of in the case at bar relate to the management or disposition of plan assets, differentiating between discretionary and ministerial functions is unnecessary. Edmonson I, 777 F. Supp. 2d at 886.

13

Insurance Company receives proof of claim acceptable to it" and "[u]nless otherwise elected, payment for loss of life will be made in <u>one lump sum</u>." <u>Id.</u> at 25 (emphasis added).  In accordance with the terms of the policies, certain beneficiaries under the policies submitted valid claims for death benefits to UNUM.  UNUM approved the claims and mailed each beneficiary a checkbook and a letter, advising them that the proceeds plus applicable interest owed to them had been deposited in an UNUM Security Account, that they could write checks from $250 up to the balance in the account, and that the applicable interest rate paid to them would be set at a variable rate.  <u>Id.</u>

These beneficiaries then brought a putative class action lawsuit against UNUM, alleging that UNUM breached its fiduciary duties under ERISA Sections 404(a) and 406(b) by retaining and investing the funds backing the Security Accounts for its own profit.  UNUM subsequently moved to dismiss the action, and the district court granted the motion.  <u>Id.</u>

On appeal, the First Circuit vacated the judgment of the district court and remanded the case for further proceedings.  Initially, the court held that UNUM did not discharge its fiduciary obligations when it established the Security Accounts and mailed plaintiffs their checkbooks.  According to the court, "delivery of the checkbook did not constitute a 'lump sum payment' called for by the policies," and "[t]he difference between delivery of a check and a checkbook . . . is the difference between UNUM retaining or UNUM divesting possession of Plaintiffs' funds." <u>Id.</u> at 26. (citation omitted) (alteration in original).  Therefore, "until the beneficiaries received the lump sum payments to which they were entitled, UNUM remained obligated to carry out its fiduciary duty under the plan." <u>Id.</u>

The First Circuit further held that "the sums due plaintiffs remain[ed] plan assets subject

to UNUM's fiduciary obligations until actual payment." Id.   As the court observed, "[u]ntil a beneficiary draws a check on the Security Account, the funds represented by that check are retained by UNUM and UNUM had the use of the funds for its own benefit." Id.   Therefore, "[t]o say that the funds are 'deemed to belong' to the beneficiaries obscures the reality that UNUM had possession of them and enjoyed their use." Id.   Accordingly, the court concluded that "the euphemistically named 'Security Account,' accompanied with a checkbook, was no more than an IOU which did not transfer the funds to which the beneficiaries were entitled out of the plan assets." Id. at 27.[7]

### 3.    Faber v. Metropolitan Life Insurance Company

In Faber, the Second Circuit reached a contrary result, albeit on slightly different facts. There, as in Mogel, Metropolitan Life Insurance Company ("MetLife") paid death benefits to beneficiaries under two group life insurance plans through the use of retained asset accounts called Total Control Accounts ("TCAs").  648 F.3d at 101.  When the holder of a TCA would write a check against the account, MetLife would transfer funds sufficient to cover the draft to the bank servicing the account until the full amount of death benefits owed to the holder was paid. Id.  While the TCA remained open, however, MetLife retained the funds backing the accounts in its own general account and invested those funds for its own profit. Id.[8]

The summary plan description for one of the two policies provided that "[p]ayment of a

---

[7]In Mogel, the First Circuit also determined the "guaranteed benefit policy" exemption set forth in Section 401(b)(2) of ERISA, 29 U.S.C. § 1101(b)(2), did not apply.  547 F.3d at 27. This Court reached the same conclusion in this case on Lincoln's Motion to Dismiss.  Edmonson I, 777 F. Supp. 2d at 889-91.

[8]The opinion in Mogel, unlike Faber, does not specify when UNUM would transfer funds to the Security Accounts or whether it held those funds in its own general account.

15

death benefit of $7,500 or more is made under MetLife's Total Control Account," whereby "[t]he death benefit amount is deposited in an interest bearing money market account and [the] beneficiary is provided with a checkbook to use for writing checks to withdraw funds."  Id. at 100-01.  Similarly, the summary plan description for the other policy provided, "[i]f the benefit from a single claim is $6,000, or more, [the] beneficiary may receive basic life insurance benefits under one of the several options available under the Beneficiary's Total Control Account (TCA) Program," whereby the beneficiary receives a "personalized checkbook . . . to easily use all, or a portion, of the money" and "[f]unds left with the insurance company earn interest at competitive rates." Id. at 101.[9]

Certain beneficiaries under the policies submitted claims for death benefits to MetLife, and once their claims were approved, MetLife established TCAs in their names and provided them each with a checkbook and customer agreement, which laid out the terms of the TCA relationship.  Id.  The agreement specified that MetLife would set the interest rate for the TCA weekly based on the performance of certain money market indices.  Id.

Thereafter, these beneficiaries brought a putative class action lawsuit against MetLife, alleging that MetLife breached its fiduciary duties under ERISA Sections 404(a) and 406(b) by retaining and investing the funds backing their TCAs for its own profit, even though they had already received the entire amount of death benefits plus interest owed to them under the policies.  Id.  MetLife subsequently moved to dismiss the action, and the district court granted the motion.  Id.

---

[9]The Second Circuit relied on the summary plan descriptions in Faber because the actual policies were not in the record.  648 F.3d at 107 n.5.

16

On appeal, following briefing and oral argument, the Second Circuit invited the Department of Labor (the "DOL") – the agency charged with administering Title I of ERISA – to submit its views on certain issues presented.   Id. at 102.  In response, the DOL submitted an opinion letter (the "Opinion Letter" or "DOL Op."),[10] in which the agency took the position that MetLife discharged its ERISA fiduciary duties when it furnished beneficiaries with TCAs in accordance with the terms of the plan and did not retain plan assets by holding and investing the funds backing the accounts.  (DOL Op. at 6-15.)   In the letter, the DOL outlined its view that once Metlife created a TCA, credited it with funds due, and provided the beneficiary with a checkbook, ERISA no longer governed the relationship between MetLife and the account holder. (Id.)

Ultimately, the Second Circuit affirmed.  Unlike in Mogel, the court held that MetLife was not acting in a fiduciary capacity when it invested the funds backing plaintiffs' TCAs because it "discharged its fiduciary obligations as a claims administrator and ceased to be an ERISA fiduciary when, in accordance with the policies, it created plaintiffs' TCAs, credited them with the amount of benefits due, and issued checkbooks enabling Plaintiffs to withdraw their proceeds at any time."  Id. at 104.  Noting that sponsors of employee welfare benefit plans are generally afforded wide latitude to design the method by which benefits are to paid, the court reasoned that:

> Plan sponsors . . . were free, for example, to design their Plans to pay life

---

[10]On February 24, 2011,  while Faber was still pending on appeal, Plaintiff submitted a letter – to which Lincoln responded – putting the DOL's Opinion Letter before the Court.  (See ECF Nos. 35 & 37.)  In its prior opinion on Lincoln's Motion to Dismiss, the Court took note of the DOL Opinion Letter and the agency's conclusions therein.  See Edmonson I, 777 F. Supp. 2d at 887 n. 10.

> insurance benefits in lump sums. But that is not what they did.  Instead, the
> [summary plan descriptions] expressly provide that death benefits will be paid
> through the establishment of a TCA, and MetLife acted in accordance with these
> provisions. Nothing in the [summary plan descriptions], or in the complaint,
> provides any indication that after the TCAs were established either Plaintiffs or
> MetLife contemplated an indefinite fiduciary relationship. As the district court
> recognized, once the TCAs were set up and credited, MetLife had provided all of
> the benefits promised by the Plans, in the manner contemplated by the Plans.

Id. at 104-05.  After this point, the court made clear, the relationship between MetLife and

plaintiffs was no longer governed by ERISA; rather, it "constituted a straightforward

creditor-debtor relationship governed by the Customer Agreements and state law."  Id. at 105.

        Next, the Second Circuit rejected plaintiffs' contention that MetLife remained an ERISA

fiduciary after establishing the TCAs because the funds in its general account backing them

qualified as plan assets.  As an initial matter, the court determined that "the DOL's approach of

defining 'plan assets' consistent with 'ordinary notions of property rights' [was] persuasive and

[thus] entitled to [] deference [under Skidmore v. Swift, 323 U.S. 134 (1944)]."  Faber, 648 F.3d

at 106.  The court explained:

> [W]e agree with the DOL that MetLife's "retained assets" are not "plan assets"
> because the Plans do not have an ownership interest—beneficial or otherwise—in
> them. Nothing in the [summary plan descriptions] or Customer Agreements
> suggests that general account funds become plan assets once MetLife gives a
> beneficiary control of his proceeds through a TCA.  Once the TCAs were credited,
> MetLife's remaining obligations are to honor checks drawn on the TCAs and to
> pay interest at the stipulated rate.

Id. (citation omitted).  This relationship, the court concluded, "involves MetLife simply as a

debtor and the beneficiary-turned-account holder simply as a creditor—a relationship

fundamentally different from an ERISA fiduciary relationship with its panoply of discretionary

authority and responsibility."  Id.

18

Finally, the Second Circuit declined plaintiffs' invitation to follow <u>Mogel</u>.  Although the court recognized that <u>Mogel</u> involved a similar claim, the court distinguished <u>Mogel</u> on its facts. According to the court, unlike the MetLife policies at issue, "the UNUM group life insurance policies at issue [in <u>Mogel</u>] expressly provided that 'payment for loss of life will be made in <u>one lump sum</u>.'" <u>Id.</u> (quoting <u>Mogel</u>, 547 F.3d at 25) (emphasis in original).  Thus, UNUM acted inconsistently with those terms by opening Security Accounts and issuing checkbooks instead of tendering lump-sum payments.  <u>Id.</u>

The Second Circuit further explained that "<u>Mogel</u> is better understood as predicated on the fact, not present here, that the insurer failed to abide by plan terms requiring it to distribute benefits in lump sums."  <u>Id.</u> at 106-07.  The court observed that "much of the First Circuit's opinion is devoted to establishing that payment by [a retained asset account] is not, in fact, the same thing as payment by lump sum."  <u>Id.</u> at 107.  But, the court concluded, "while that distinction was dispositive in <u>Mogel</u> because the plans obligated UNUM to distribute benefits by lump sum payment, it is not determinative here, where the [summary plan descriptions] expressly provide that MetLife will distribute benefits by the establishment of a TCA."  <u>Id.</u>[11]

## B.    Application of ERISA Framework

Notwithstanding that neither <u>Mogel</u> nor <u>Faber</u> is binding on this Court, both cases are factually distinguishable from the instant case.  To be sure, in <u>Mogel</u>, the terms of the life insurance policies at issue expressly provided that death benefits would be paid in one lump sum

---

[11]In <u>Faber</u>, the Second Circuit also held that plaintiffs had standing to pursue their claims and that the "guaranteed benefit policy" exemption set forth in Section 401(b)(2) of ERISA, 29 U.S.C. § 1101(b)(2), did not apply.  648 F.3d at 102-03, 105 n.1.  This Court reached similar conclusions in this case on Lincoln's Motion to Dismiss.  <u>Edmonson I</u>, 777 F. Supp. 2d at 879-83, 889-91.

payment, and UNUM failed to comply with those terms by paying beneficiaries death benefits

through the use of retained asset accounts. And in <u>Faber</u>, the terms of the life insurance policies

at issue expressly provided that death benefits would be paid through the use of retained asset

accounts, and MetLife did just that. In this case, however, unlike both <u>Mogel</u> and <u>Faber</u>, the

terms of the Policy at issue are silent as to the method by which death benefits are to be paid.

But, for the reasons set forth below, the Second Circuit's rationale in <u>Faber</u> is more persuasive on

the facts of this case.

        1.        **"Authority or Control"**

        Lincoln contends that it is entitled to summary judgment because it lacked "any authority

or control" over the management or disposition of the funds backing Plaintiff's SecureLine

Account when it retained those funds and invested them for its own profit. The Court agrees.

        As this Court previously recognized, an entity exercises "authority or control" over the

management or disposition of plan assets only if it has "practical control" over those assets.

<u>Edmonson I</u>, 777 F. Supp. 2d at 886-87; <u>see also</u> <u>Chao v. Day</u>, 436 F.3d 234, 237-38 (D.C. Cir.

2006) (holding that broker had sufficient authority or control over plan assets to qualify as an

ERISA fiduciary because he "solicited, accepted, and then pilfered the plans' assets by reneging

on his promise to purchase insurance for the plans' members"); <u>Estate of Simper</u>, 407 F.3d at

1133 (holding that defendants, one of whom would receive contributions from the plan, deposit

them into his business account, and write checks on behalf of the plan for the amount of the

contribution, had practical control over plan assets); <u>Srein</u>, 323 F.3d at 222-23 ("When, as here, a

trustee bank is entrusted with and performs duties to 'control, manage, hold, safeguard and

account for [a] fund's assets and income,' it functions as a fiduciary under ERISA." (quoting

Wettlin Assocs., 237 F.3d at 275)); IT Corp., 107 F.3d at 1421-22 (observing that insurer could have been an ERISA fiduciary because it had a bank account containing plan funds and the right to write checks on that account by which it could deplete those funds).

The performance of administrative and ministerial tasks by a mere custodian of plan assets does not amount to practical control.  In re Mushroom Transp. Co., 382 F.3d 325, 347 (3d Cir. 2004) (granting summary judgment to defendant because "[n]either the allegations nor the evidence [] suggest that [defendant] did anything more than serve as the holder of assets placed there pursuant to the Stipulation"); see also Chao, 436 F.3d at 237-38 (clarifying that fiduciary status is not extended to every person who exercises "mere possession, or custody" over plan assets);; Srein, 323 F.3d at 222-23 (holding that defendant was acting as a fiduciary because it was "more than a mere custodian of assets performing only administrative and ministerial duties"); Wettlin, 237 F.3d at 275 ("ERISA does not consider as a fiduciary an entity such as a bank when it does no more than receive deposits from a benefit fund on which the fund can draw checks."); Edmonson I, 777 F. Supp. 2d at 886-87 ("[P]hysical possession of plan assets is insufficient to incur fiduciary duties . . . .").  Thus, in this case, the relevant question is whether Lincoln was performing more than just administrative and ministerial duties in a custodial capacity when it retained the funds backing Plaintiff's SecureLine Account and invested them for its own profit.

### a.      Compliance With Plan Terms

As an initial matter, ERISA creates a "division of authority between a plan's sponsor and the plan's administrator."  Cigna Corp. v. Amara, 131 S. Ct. 1866, 1877 (2011).  Generally, the plan's sponsor "creates the basic terms and conditions of the plan, executes a written instrument

containing those terms and conditions, and provides in that instrument a 'procedure' for making amendments." Id.   The plan's administrator, on the other hand, "manages the plan, follows its terms in doing so, and provides participants with the summary documents that describe the plan (and modifications) in readily understandable form." Id.

ERISA does not specify a particular choice in the method of payment of benefits. See Woolsey v. Marion Labs., Inc., 934 F.2d 1452, 1457 (10th Cir. 1991) ("ERISA does not mandate any specific mode of payment of retirement benefits." (quoting Oster v. Barco of Cal. Emps.' Retirement Plan, 869 F.2d 1215, 1218 (9th Cir. 1988))); Pompano v. Michael Schiavone & Sons, Inc., 680 F.2d 911, 916 (2d Cir.1982) ("Neither [ERISA] nor its legislative history comments on the mode or manner in which benefits should be paid."). Thus, "[t]he sponsor of an employee welfare benefit plan is generally afforded wide latitude to design the plan, including the mechanism for distributing benefits, as it sees fit." Faber, 648 F.3d at 104; see also Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999) (noting that plan sponsor makes the "decision regarding the form or structure of the Plan such as who is entitled to receive Plan benefits and in what amounts, or how such benefits are calculated"); Lockheed Corp. v. Spink, 517 U.S. 882, 894 (1996) ("ERISA 'leaves th[e] question' of the content of benefits 'to the private parties creating the plan. . . .  [T]he private parties, not the Government, control the level of benefits." (quoting Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511 (1981)) (alterations in original)).

In this case, as in Faber, the plan sponsor could have specified in the Policy that death benefits would be paid in lump sums, but that is not what it did.  Instead, the plan sponsor chose not to specify any method of payment.   Therefore, nothing in the Policy prohibited Lincoln – in

its capacity as plan administrator – from using a SecureLine account to pay Plaintiff the death benefits owed to her.

Of course, Lincoln was required to comply with the other terms of the Policy in selecting a method of payment, including the requirement that it pay benefits "immediately" upon proof of claim. And Lincoln did just that. Indeed, the day after Lincoln approved Plaintiff's claim for benefits, it notified her that it had established a SecureLine account in her name and had credited it with the amount of death benefits owed to her. Lincoln also provided her with a checkbook so that she could draw on the account as she pleased. Once it took these steps, Lincoln had provided Plaintiff all of the benefits called for by the plan. To be sure, at any point thereafter, Plaintiff could simply write a check up to the full balance of her account and receive the total life insurance proceeds owed to her.

Plaintiff contends, however, that the Policy provision providing that Lincoln would pay benefits "immediately" upon proof of claim required it to pay Plaintiff the life insurance proceeds owed to her in one lump sum. The Court disagrees. That provision expressly addresses the timing of payment, not the method of payment. (See McKinnon Decl., Ex. 4, at Edmonson 077 ("TIME OF PAYMENT OF CLAIMS").) Plaintiff points to no other language in the Policy suggesting otherwise.[12] Thus, for the Court to construe the term "immediately" as the equivalent

---

[12]Indeed, the only other Policy provisions that Plaintiff claims support her position are irrelevant to the instant dispute. One of those provisions, which appears in a section titled "DEATH BENEFIT," provides:

AMOUNT PAYABLE ON DEATH. Upon receipt of satisfactory proof of an Insured Person's death, the Company will pay a death benefit equal to the amount of Personal Life Insurance in effect on the date of death. This amount is shown in the Schedule of Insurance. The benefit will be paid as shown in the Beneficiary, Facility of Payment, and Settlement Options sections.

of "lump sum" would not only be a stretch; it would essentially be a reformation of the Policy.

Accordingly, because Lincoln did not violate any terms of the plan in selecting a method of payment, the relevant facts of this case are more analogous to those of <u>Faber</u> than <u>Mogel</u>. The Court acknowledges, however, that the summary plan descriptions in <u>Faber</u> – in contrast to the Policy at issue here – expressly provided for the payment of death benefits through retained asset accounts. But in light of the foregoing authorities, the Court does not believe that Congress intended ERISA to be used as a mechanism for micro-managing a plan when it is silent as to the method of payment and the plan administrator does not violate its terms in any way.[13]

---

(McKinnon Decl., Ex. 4 at Edmonson 070.) The other provisions, which immediately follow the foregoing provision in a section titled "SETTLEMENT OPTIONS," provide:

> INSTALLMENTS.  All or part of the death benefit may be received in installments, by making written election to the Company.

> ELECTION.  While living, an Insured Person may direct the Company to pay the death benefit in installments.  If no such direction is in effect at the time of the Insured Person's death, the Beneficiary may make such an election.

(<u>Id.</u>)  In this case, the operative benefits provision is the "DEPENDENTS LIFE INSURANCE" provision, not the "DEATH BENEFIT" provision, because Plaintiff's husband was insured as a "Dependent" under the Policy.  Both the "DEATH BENEFIT" provision and the "SETTLEMENT OPTIONS" provision, by their terms, only apply upon the death of an "Insured Person," who in this case was Plaintiff.

[13]For this reason, the Court also declines Plaintiff's invitation to adopt the principle that payment must be in the form of money unless the parties agree otherwise.  <u>See, e.g.</u>, <u>In re Westpoint Stevens, Inc.</u>, 600 F.3d 231, 259 (2d Cir. 2010) (noting that payment of debt "must be in money, unless the parties agree otherwise, or the obligee consents to accept some other medium of payment" (quoting <u>Bank of Boston Conn. v. Platz</u>, 596 A.2d 31, 32 (Conn. Super. Ct. 1991)) (collecting authorities)).  Plaintiff does not cite – nor is the Court aware of – any case importing this principle into the ERISA context, much less in analogous circumstances to this case.

Moreover, the Court rejects Plaintiff's contention that <u>Amara v. Cigna Corp.</u>, 131 S. Ct.

b.      **Shift of Practical Control**

More importantly, once Lincoln established Plaintiff's SecureLine account, credited it with the amount of death benefits owed to her, and issued her a checkbook with which she could draw on the account, Lincoln relinquished and shifted all practical control of the Plaintiff's proceeds to her directly.  From that point forward, Lincoln's remaining obligations were simply to honor Plaintiff's checks and pay interest on her account at a specified rate – duties which are clearly administrative and ministerial.  Therefore, as a practical matter, when the actions complained of took place, Lincoln gave Plaintiff ultimate control of her proceeds through a SecureLine account.  See Faber, 648 F.3d at 106 (noting that "MetLife gives a beneficiary control of his proceeds through a TCA") (emphasis added).

Indeed, once her SecureLine account was created, Plaintiff could have withdrawn funds from the account up to the balance of death benefits owed to her as she wished.  She could have done so in increments, or withdrawn the entire amount at once.  In fact, Plaintiff did exactly that.  Only a few months after her SecureLine Account was established, Plaintiff withdrew the entire amount from the account in a single draft, effectively receiving precisely what she claims she was entitled to under the plan – payment of her death benefits in one lump sum.  Accordingly, by shifting practical control over Plaintiff's death benefits to her directly, Lincoln discharged its

---

1866, 1877-78 (2011), which determined that summary plan descriptions are not part of the plan itself, undermines Faber.  As the Second Circuit itself recognized, plaintiffs in Faber "never alleged in the complaint, nor argued in their initial or reply briefs on appeal, that the [summary plan descriptions] misrepresented or are inconsistent with the underlying Plans," and even relied on the summary plan descriptions themselves in support of their case.  648 F.3d at 107 n.5.

fiduciary obligations under ERISA.[14]

In reaching this conclusion, the Court recognizes that Lincoln had custody over the funds backing Plaintiff's SecureLine account when it invested them for its own profit. Indeed, Lincoln retained those funds in its general account, and only transferred funds to her SecureLine Account when she wrote a check against the account. Although this arrangement suggests that Plaintiff bore the risk of loss in connection with the funds backing her account,[15] Lincoln did not become an ERISA fiduciary by virtue of mere custody of those funds. Rather, the overriding consideration is that Lincoln did not have practical control of them. Therefore, Lincoln was not acting as an ERISA fiduciary when it retained the funds backing Plaintiff's SecureLine account and invested them for its own profit.

---

[14]Even if the actions complained of did relate to the management or administration of a plan itself in addition to the management or disposition of plan assets, the Court would reach the same conclusion. Although the selection of a mode of payment is a discretionary function, the processing of claims – which, in this case, includes honoring checks drawn on SecureLine Accounts and paying interest on those accounts – are clearly ministerial functions. See, e.g., Confer v. Custom Eng'g Co., 952 F.2d 34, 39 (3d Cir. 1991) (explaining that defendants who "perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles"); Kerns v. Benefit Trust Life Ins. Co., 992 F.2d 214, 216 (8th Cir. 1993) ("Even if [defendant] was an ERISA fiduciary with respect to claims handling, . . . it was not a fiduciary with respect to the functions at issue in this case – participant and beneficiary notification, premium payment, and policy lapse and reinstatement."). Thus, once Lincoln established Plaintiff's SecureLine account, credited it with the amount of death benefits owed to her, and issued her a checkbook with which she could draw on the account, Lincoln would have discharged its fiduciary obligations under ERISA in relation to the management or administration of the plan itself.

[15]Hypothetically speaking, if Lincoln declared bankruptcy, dissolved, or suffered any other financial crisis, funds kept in its general account – including those backing SecureLine accounts – would likely be at risk of depletion. In such circumstances, beneficiaries with SecureLine accounts might not be able to receive the death benefits owed to them.

2.      "Plan Assets"

Lincoln also contends that it is entitled to summary judgment for the independent reason that the funds backing her SecureLine account were not "plan assets."  Again, the Court agrees with Lincoln's position.

a.      Deference to DOL Opinion Letter

As this Court previously observed, ERISA itself offers no clear definition of the term "plan assets" in the context of this case.  Edmonson I, 777 F. Supp. 2d at 888-89.  Lincoln contends, however, that the DOL's interpretation of "plan assets" expressed in the Opinion Letter issued by the agency in Faber is entitled to deference.  In response, Plaintiff contends that the DOL's position in the letter is not entitled to deference because it is not thorough, it contravenes the purposes of ERISA, and it is ultimately unpersuasive.

In the Opinion Letter, the DOL took the position that "the assets of a plan generally are to be identified on the basis of ordinary notions of property rights."  (DOL Br. at 2 (quoting U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993))).  Applying this approach to the facts of Faber, the DOL concluded that the funds backing plaintiffs' retained asset accounts were not "plan assets."  (Id. at 10.)

As a threshold matter, Lincoln does not contend that the DOL's interpretation of "plan assets" in the Opinion Letter is entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984).  Instead, Lincoln contends – quite correctly – that the DOL's interpretation is only entitled to the lesser degree of deference called for by Skidmore v. Swift, 323 U.S. 134 (1944).

"'Interpretations such as those in opinion letters – like interpretations contained in policy

27

statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant Chevron-style deference.'" Parker v. Nutrisystem, Inc., 620 F.3d 274, 278 (3d Cir. 2010) (quoting Christensen v. Harris County, 529 U.S. 576, 587 (2000)). Rather, "interpretations contained in formats such as opinion letters are 'entitled to respect' based on an agency interpretation's power to persuade." Id. (quoting Christensen, 529 U.S. at 587 (citing Skidmore 323 U.S. at 140))).[16] Under Skidmore, the persuasiveness of an agency's interpretation depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Christensen, 529 U.S. at 587 (quoting Skidmore, 323 U.S. at 140).

Both the Supreme Court and the Third Circuit have found DOL interpretations contained in opinion letters to be persuasive under Skidmore in appropriate circumstances. See, e.g., Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, 541 U.S. 1, 17-18 (2004) (finding DOL opinion letter persuasive because it "accords with our comprehension of [the] definition and coverage provisions" of Title I of ERISA); Sommer v. Vanguard Group, 461 F.3d 397, 400 & n.3 (3d Cir. 2006) (finding persuasive "several opinion letters" issued by the DOL "detailing how companies should compute bonuses of those employees who take FMLA leave"). But c.f., e.g., Parker, 620 F.3d at 282 (finding that DOL opinion letters did not provide "sufficiently thorough reasoning, consistency, or factual similarities to the instant case to warrant deference"); Lawrence v. City of Philadelphia, 527 F.3d 299, 316 (3d Cir. 2008) (finding DOL opinion letter

---

[16]Whether the DOL's Opinion Letter is construed as an "opinion letter" or an "amicus brief" is of no moment for purposes of determining the appropriate deference standard because Skidmore deference applies to the latter format as well. See Riegel v. Medtronics, Inc., 552 U.S. 312, 338 n.8 (2008) ("An amicus brief interpreting a statute is entitled, at most, to deference under Skidmore.").

unpersuasive because "the factual scenario upon which the [] opinion letter was based was substantially different from the scenario . . . before us").

In this case, the Court finds the DOL's approach to defining "plan assets" in the Opinion Letter to be persuasive under Skidmore for a number of reasons.  First, in Faber, the Second Circuit already deferred to the agency's approach in strikingly similar circumstances as the case at bar.  648 F.3d at 105-07.  Additionally, as both the Faber court and this Court previously recognized, the DOL has over time consistently interpreted the term "plan assets" in accordance with "ordinary notions of property rights."  Id. at 105-06 & n.3 (collecting DOL advisory opinions); Edmonson I, 777 F. Supp. 2d at 889 (citing U.S. Dep't of Labor, Advisory Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)).  Moreover, several courts of appeals have previously applied the DOL's approach in other factual contexts.  See In re Halpin, 566 F.3d 286, 289-92 (2d Cir. 2009); Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 647 (8th Cir. 2007); In re Luna, 406 F.3d 1192, 1199 (10th Cir. 2005).  Thus, like the Faber court, this Court will accord the DOL's interpretation of "plan assets" in the Opinion Letter deference under Skidmore.

Plaintiff's arguments to the contrary notwithstanding, neither Mogel nor its progeny compel a different result.  See Otte v. Life Ins. Co. of N. Am., No. 09–CV–11537–RGS, 275 F.R.D. 50, 55-56 (D. Mass. 2011); Lucey v. Prudential Ins. Co. of Am., 783 F. Supp. 2d 207, 212 (D. Mass. 2011); Keife v. Metro. Life Ins. Co., 797 F. Supp. 2d 1072, 1077 (D. Nev. 2011); Vander Luitgaren v. Sun Life Ins. Co. of Canada, No. 1:09-cv-11410, 2010 WL 4722269, at *1 (D. Mass. Nov. 18, 2010).  Because Mogel predates the DOL's Opinion Letter, the First Circuit did not have the opportunity to determine whether the agency's view on a virtually identical

claim premised on the use of retained asset accounts was entitled to deference, as the Second

Circuit did in <u>Faber</u> and as the Court does here.  Moreover, to the extent <u>Mogel</u>'s interpretation

of "plan assets" deviates from the DOL's approach of defining "plan assets" in accordance with

ordinary notions of property rights, it conflicts with significant authority from other courts of

appeals deferring to and applying that approach.[17]  Therefore, <u>Mogel</u>, and the cases which relied

upon it, do nothing to alter the Court's conclusion that the DOL's approach is entitled to

deference.[18]

     In deferring to the Opinion Letter, though, the Court is mindful that it is only entitled to

respect based on its power to persuade, and that it was not issued by the DOL in connection with

this litigation.  While <u>Faber</u> may have involved nearly identical facts to the present case,

differences nevertheless exist.  That said, the Court still owes deference to the agency's general

approach of defining "plan assets" in accordance with ordinary notions of property rights.

Therefore, the Court will apply this approach to the specific facts of this case.

---

    [17]Nevertheless, as discussed below, the First Circuit may very well have reached the same result in <u>Mogel</u> by applying the DOL's approach because the determination of whether a particular item is a plan asset is a fact-specific inquiry.

    [18]For the same reasons, the Court also rejects Plaintiff's contention that "plan assets" should be construed in accordance with <u>Acosta v. Pacific Enterprises</u>, 950 F.2d 620 (9th Cir. 1992), as opposed to ordinary notions of property rights.  There, the Ninth Circuit indicated that the determination of a plan asset required an assessment of "whether the item in question may be used to the benefit (financial or otherwise) of the fiduciary at the expense of plan participants or beneficiaries."  <u>Id.</u> at 620.  A number of courts, including some district courts in the Third Circuit, have applied this approach.  <u>See, e.g.</u>, <u>Prof'l Staff Leasing Corp. v. Unicare Life & Health Ins. Co.</u>, No. 02-CV-11-JFF, 2003 WL 21359621, at *5 (D. Del. Mar. 31, 2003); <u>AT&T Co. v. Empire Blue Cross & Blue Shield</u>, No. 93-CV-1224 (HLS), 1994 WL 16057794, at *10 (D.N.J. July 19, 1994).  Like <u>Mogel</u>, <u>Acosta</u> predates the Opinion Letter issued by the DOL in <u>Faber</u> and its approach to defining "plan assets" conflicts with more recent appellate authority deferring to and applying the DOL's approach.

b.        **Ordinary Notions of Property Rights**

In the DOL's view, under ordinary notions of property rights, "plan assets" include "any

property, tangible or intangible, in which the plan has a beneficial ownership interest,"

considering "any contract or other legal instrument involving the plan, as well as the actions and

representations of the parties involved."  (DOL Op. at 2 (quoting U.S. Dep't of Labor, Advisory

Op. No. 93-14A, 1993 WL 188473, at *4 (May 5, 1993)).)  Thus, the relevant question in this

case is whether the Plan had an ownership interest in the funds backing the SecureLine accounts

when Lincoln retained those funds and invested them for its own profit.

As is apparent from the DOL's Opinion Letter, Faber, and those court of appeals cases

applying the DOL's approach in other factual contexts, such an inquiry is largely dependent on

the specific facts of a given case.  See DOL Op. at 12 (noting that "the determination of whether

a particular asset is a "plan asset" requires a factual inquiry into the parties' representations and

understandings"); Faber, 648 F.3d at 106 (holding that plans did not have ownership interest in

funds backing retained asset accounts because "[n]othing in the [summary plan descriptions] or

Customer Agreements suggests that general account funds become plan assets once MetLife

gives a beneficiary control of his proceeds through a TCA"); Halpin, 566 F.3d at 290-91 (holding

that unpaid employer contributions were not plan assets because, "[a]lthough [the parties] were

free to contractually provide for some other result, nothing in the Plan Documents indicates that

they did so"); Kalda, 481 F.3d at 647 (holding that unpaid contributions did not qualify as plan

assets because "[i]t would be unreasonable to conclude from [the] balance sheets that the plans

had acquired a beneficial interest in the unpaid contributions under ordinary notions of property

rights"); cf. Luna, 406 F.3d at 1200-01 (holding that plan held "a future interest in the collection

31

of the contractually-owed contributions" without reference to plan documents in part because they were "at best ambiguous regarding the point when unpaid contributions become plan assets").  Faber, however, is particularly instructive because most – though not all – of the relevant facts in that case are the same as those here.

In this case, as in Faber, nothing in the Policy, the Claim Form, or the Terms and Conditions suggests that the Plan retains an ownership interest in the funds backing the SecureLine Accounts after they are created.  Indeed, as in Faber, once those accounts are credited with the amount of death benefits due and a checkbook is provided to the account holder, Lincoln's only remaining obligations are to honor checks drawn on the account and pay interest on the account at a stipulated rate.  Thus, after that point, as in Faber, the relationship between Lincoln and a beneficiary, such as Plaintiff, is analogous to one between a creditor and debtor – "a relationship fundamentally different from an ERISA fiduciary relationship with its panoply of discretionary authority and responsibility."  Faber, 648 F.3d at 106.

That the Policy is silent as to the method of payment does not reasonably lead to the conclusion, as Plaintiff would have it, that the Plan retains an ownership interest in the funds backing the SecureLine accounts after they are created.  To be sure, there is no language in the Policy specifying that death benefits would be paid in a lump sum payment or segregated and held in trust for the Plan.  Nor were they.  Lincoln held the funds backing SecureLine accounts in its general account and only transferred sufficient funds to cover drafts on the accounts when checks were presented for payment.  Accordingly, the funds backing the SecureLine accounts were not "plan assets" because the Plan "d[id] not have an ownership interest – beneficial or otherwise – in them."  Faber, 648 F.3d at 106.

**VII.    Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment is

GRANTED and Plaintiff's Cross-Motion for Partial Summary Judgment is DENIED.

Accordingly, Plaintiff's Motion for Class Certification, Plaintiff's Motion to Compel Discovery,

and Defendant's Motion to Stay Discovery are DENIED as moot.  An appropriate order follows.


O:\CIVIL 09-10\10-4919 Edmonson v. Lincoln National\Memo re MSJ.wpd